UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

LIZBETH VALDEZ,

Plaintiff,

v.

AT&T UMBRELLA BENEFIT
PLAN No. 1,

Defendant.

Case No.:  16-cv-2613-BTM-BGS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**[ECF Nos. 31, 41, 42]**

## I.    INTRODUCTION

Plaintiff Lizbeth Valdez brings this action for short and long term disability benefits under 29 U.S.C. § 1132(a)(1)(B), which provides for civil enforcement of employee benefit plans pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"),  29 U.S.C. §§ 1001 *et seq.*  Plaintiff asserts her short term disability benefits were wrongfully denied and that but for the wrongful denial, she would be entitled to long term benefits.  Pending before the Court are cross-motions for summary judgment submitted by Plaintiff and Defendant AT&T Umbrella Benefit Plan No. 1 ("the Plan").  The question before the Court on summary judgment is whether the Plan administrator's decision to deny Plaintiff's

short term disability benefit claim was an abuse of discretion. For reasons set forth below, the Court concludes that it was.

## II. BACKGROUND

## A. FACTS

### 1. The Disability Plan

As an employee of Pacific Bell Telephone Company ("PacBell"), Plaintiff was a participant in AT&T Umbrella Benefit Plan No. 1 ("the Plan"), which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). A third-party claims administrator, Sedgwick Claims Management Services ("Sedgwick" or "the claim administrator"), determines all claims and appeals for benefits under the Plan. (AR 88). Regular claims are determined by Sedgewick employees at AT&T Integrated Disability Service Center; Sedgewick's Quality Review Unit decides appeals and denials of benefit claims under the Plan. (AR 93, 94).

The Plan provides short term disability ("STD") benefits upon a showing of disability. Under the Plan, a participant is disabled when she has "a sickness, injury or other medical, psychiatric or psychological condition that prevents [her] from engaging in [her] normal occupation or employment . . . in accordance with [her employer's] normal practices." (AR 64, 69). If a participant is "able to perform a modified duty" and her employer "is able to accommodate [her] restrictions," then the participant is not considered disabled. (AR 64, 69).

In order to be considered for STD benefits under the Plan, the participant must "be under the care of a physician and follow a treatment plan that is reasonably designed (where practicable) to result in [the participant's] recovery and return to work." (AR 69). The participant must periodically file medical evidence of her disability, and her medical providers must furnish medical reports and necessary information to the claims administrator in a timely manner. (AR 69). STD benefits are terminated if the participant "fail[s] to furnish objective

2

Medical Evidence" of her alleged disability or "fail[s] to follow a medically appropriate treatment plan that is reasonably designed (where practicable)" to facilitate her recovery and eventual return to work. (AR 75). The claim administrator may require claimants to undergo additional medical examinations before making an STD benefits determination. (AR 70). Claimants are not required to pay for these requested medical examinations. (AR 70).

### 2. Plaintiff's Job Duties and Diagnoses

In April 2015, Plaintiff Lizbeth Valdez began working as a sales consultant at PacBell. (AR 124). Plaintiff's work duties included answering customer phone calls while wearing a headset and entering customer data into the computer. (Id.) The work was largely sedentary, involving reading, typing, and using a mouse while viewing a computer screen. (Id.). However, Plaintiff had been in ill health for some time.

In November 2012, when Plaintiff was 25 years old, she was diagnosed with multiple sclerosis ("MS"). Her MRI showed "innumerable dawsons fingers as well as high cervical lesion," and subsequent MRI's revealed increasing numbers of active brain lesions. (AR 119, 431-32). Between November 2012 and October 2015, Plaintiff suffered five MS related relapses. (AR 119, 436). In addition to her MS diagnosis, Plaintiff began suffering from headaches in May 2014 and was hospitalized with viral meningitis in July 2014. (AR 340). The following year, she was diagnosed with depression secondary to her MS. (AR 340). As early as July 2015, Plaintiff began suffering from chronic migraine headaches that led her to seek medical attention. (AR 117, 340). These chronic migraines are the basis for Plaintiff's STD benefits claims and appeals.

Migraines are defined as "painful, throbbing headaches" that "may cause nausea and vomiting and make you sensitive to light, sound or smell." (AR 468). Left untreated, migraines can last from four hours to a few days. (AR 468). Prescription medication helps resolve migraines, and Plaintiff's self-care

instructions included "rest[ing] in a quiet, dark room until [her] headache is gone" and avoiding watching TV or reading. (AR 469). The self-care instructions told Plaintiff to seek immediate medical care if she experienced "new or worse nausea and vomiting," "a new or higher fever," or a progressively worse headache. (AR 470).

### 3. History of Plaintiff's Benefits Claims From October 2015 to April 2016

In early October 2015, Plaintiff was hospitalized for two days after reporting head pain and vertigo. (AR 117). She was admitted for a migraine, anxiety, and possible exacerbation of multiple sclerosis. (AR 117). Her MRI was unchanged from August 2015, but showed more lesions than her November 2012 MRI. (AR 436). Plaintiff submitted her first STD claim during that hospital stay. (AR 98, 104). Her medical provider, Kaiser Permanente, submitted a work status report and a discharge summary for October 6, 2015, which stated she "was started on i/v solumedrol, was seen by [inpatient] neurology consult, had MRI head which is negative for acute issues, and . . . [was] stable to be discharged home." (AR 140). The claim administrator noted it was "unclear why [Plaintiff] could not return to work shortly after the discharge while only on [prescription management]" and without a "complex [treatment] plan." (AR 108-09). Plaintiff's claim was approved, but the claim administrator told Plaintiff she would need to submit additional medical information should she remain out of work. (AR 109).

Plaintiff continued to suffer weeks-long migraine headaches after her discharge, prompting nine medical visits between October 14 and November 17. (AR 113-122, 430, 501-09, 680). Her other symptoms included severe fatigue, insomnia, and weakness. (AR 447).

Plaintiff opened her second STD benefits claim on October 20, 2015. Kaiser Permanente submitted a work status report by Plaintiff's treating neurologist, Dr. Cynthia Elizabeth Spier, placing her off work from October 25,

2015 through November 2, 2015. (AR 200-201, 646-654). At that time, attempts to treat Plaintiff's chronic migraines included adjusting medications, providing injections, recommending once-monthly magnesium infusions, attending headache classes, adjusting her diet, obtaining therapy for anxiety and stress, and stopping narcotic medication. (AR 446-48).

The claim administrator was again skeptical of the submission. The administrator noted Plaintiff has "a history of MS" but that her MRI's showed no new lesions or complications and her chronic migraines did "not appear to be a clinical occurrence of the condition." (AR 203). The administrator concluded that the medical documentation did not establish why Plaintiff could not continue her sedentary job under the treatment plan. (AR 203). Plaintiff's claim was referred to third-party Physician Advisor, Dr. Katherine Duvall, who submitted two reports. (AR 641-42).

Dr. Duvall's initial report, which was written without consulting Plaintiff's treating physicians, recommended denying the claim. (AR 641-43). However, after making contact with Plaintiff's treating neurologist, Duvall submitted a second report that reached the opposite conclusion. (AR 633). In her second report, Duvall noted, "[i]n general, one would not expect significant objective physical exam findings or test results with migraine type headaches; however, if headaches are severe and refractory, the condition can be disabling." (AR 633). Duvall averred that "the severity of the headaches is supported by [Plaintiff's] ER visit, medication adjustments and changes, and need for steroids" and that "[h]er condition may also be complicated by her Multiple Sclerosis." (AR 634). Because Plaintiff's treatment regime changed after her November 6 visit, Duvall concluded it was medically reasonable to "allow one week" for improvement and added that "[u]pdated, objective medical information would be needed [thereafter] to support an ongoing inability to work or the need for restrictions/limitations if applicable at that time." (AR 634). Duvall concluded from an occupational

medicine perspective, Plaintiff would be unable to work until November 13, 2015 "due to severe headaches and treatment." (AR 633).

Plaintiff's benefits were approved from October 20 through November 16, 2015. (AR 633-34). However, she was denied STD benefits from November 16 onward. (AR 447). A letter to Plaintiff explained that Plaintiff's submitted documents, "a work status note and several After Visit Summary sheets dated from November 6 to November 17 2015," did not provide "detailed clinical information" and "did not contain observable findings to support an extension of disability." (AR 447).

Between December 2015 and mid-January 2016, Plaintiff sought repeated medical attention for severe headaches and worsening MS symptoms. At a December 7 visit, Dr. Spier increased Plaintiff's nortriptyline dosage, instructed her to attend a headache class and obtain a magnesium infusion, and placed her off work through early January. (AR 576-78). On December 24, 2015, Plaintiff again reported headaches, dizziness, and nausea. (AR 428). Dr. Spier administered a Toradol injection. Toradol is used in emergencies and treatment of severe migraine attacks when other medications have not worked and, because of its severe side effects, should not be used for more than five days.[1] (AR 428; ECF No. 41 at 6, n.3).

Plaintiff reported "transformed migraines," i.e., episodic migraine attacks, on January 5 and 7, 2016, prompting her neurologist to re-start Topamax and increase her nortiptyline dosage. (AR 572-73). Topamax, which helps to reduce the frequency of migraines, is accompanied by side-effects that include dizziness, loss of coordination, tingling of hands and feet, slowed thinking,

---

[1] The National Institute of Health's website states that a toradol injection, also known as a ketorolac injection, "is used for the short-term relief of moderately severe pain" and "should not be used for longer than 5 days for .. . pain from chronic (long-term) conditions." The drug "may cause serious side effects." *See Ketorolac Injection*, MedlinePlus, (last updated Dec. 18, 2018) https://medlineplus.gov/druginfo/meds/a614011.html.

16-cv-2613-BTM-BGS

nervousness, memory problems and speech problems. (AR 574).  On January 18, Plaintiff sought help for bilateral leg muscle pain, weakness, and blurred vision, and was prescribed intravenous Solu-Medrol infusion, a short-term treatment for worsening MS. (AR 420, 515; ECF No. 41 at 7, n.6).  On January 20, Plaintiff began experiencing extreme, burning pain that traveled from her feet to her legs, in addition to headaches, that led to additional Solu-Medrol treatments on January 21 and 22.  (AR 415-417).

Kaiser Permanente sent the claim administrator additional medical information on January 21, 2016.  On January 25, the claim was denied because the medical evidence was not sufficiently clear on why Plaintiff could not perform "the essential duties of [her] occupation." (AR 441).  According to the the claim administrator, Plaintiff's submission consisted of over "30 pages of listed [prescriptions]" and "labs without context."  (AR 223).  The administrator noted "these are all raw data without interpretation" that were duplicated from other submissions or corresponded with previously reviewed time periods. (AR 223).  The November denial-of-benefits was upheld and Plaintiff was advised of her right to appeal. (AR 448).

In February 2016, Plaintiff appealed the denial. (AR 225, 372, 408).  The Plan's Quality Review Unit referred Plaintiff's claim to four independent Physician Advisors:  (1) Michael A. Rater, M.D., Psychiatry; (2) Bradley Davitt, M.D., Opthalmology; (4) Amy Hopkins, M.D., Internal Medicine; and (4) Charles Brock, M.D., Neurology.

The first three Physician Advisors, who reviewed Plaintiff's claim from psychiatric, opthamologic, and internal medicine perspectives, found she did not have a disability that would prevent her from returning to work. (AR 374, 378, 390).  In relevant part, Dr. Spier made statements to Dr. Rater about Plaintiff's disability from a psychiatric perspective.  Dr. Rater's report details the conversation as follows:

Dr. Spier stated Ms. Valdez is very complicated. She did not show for her last visit. She was supposed to get a spinal tap to see if there was any evidence of viral meningitis. She had viral meningitis in 2014. Dr. Spier stated she is working on finding out why she has so many headaches. She stated the meningitis could be causing it. Dr. Spier stated she put Ms. Valdez off of work because every time she is due to go back she comes into the office stating that her symptoms are very severe. She cries in the office and will go to the ER. Dr. Spier stated she has real illnesses. She has MS (multiple sclerosis). The last visit, her legs were weak. Her exams are not reliable because she gives way and it is impossible to identify if there is any real weakness. Dr. Spier stated she cannot figure out what is going on with Ms. Valdez. She stated she does suspect that she has some secondary gain. Dr. Spier stated she is going to send Ms. Valdez for a psych evaluation. (AR 371).

Dr. Charles Brock, who reviewed Plaintiff's claim from a neurological perspective, concluded on March 16, 2016 that Plaintiff was disabled from "November 16, 2015 through present." (AR 381). Dr. Brock averred that Plaintiff was disabled and incapable of work because the documentation demonstrated "the presence of ongoing migraine headache" requiring "repeated medical visitations and medical administrations" and a "history of multiple sclerosis with a progressive episode, and experiencing weakness of bilateral lower extremities that required IV Solu-Medrol." (AR 382-83). Dr. Brock concluded Plaintiff was supported for "restrictions and limitations including no walking and no ability to tolerate working in a brightly lighted environment, prolonged viewing of a computer screen, or noisy environment due to the presence of ongoing persistent migraine headache and presence of bilateral lower extremity weakness due to the MS exacerbation." Dr. Brock added it was unreasonable to expect Plaintiff "to perform her job duties of using a headset to speak to the caller while simultaneously entering information into the computer to record caller information." (AR 383). In sum, Dr. Brock found Plaintiff was disabled from a neurological perspective. (AR 383). Plaintiff's STD benefits were approved from

October 20, 2015 through April 17, 2016. (AR 356).

On March 21, 2016, Plaintiff saw her neurologist for headaches, MS, anxiety, and dizziness. (AR 286). Dr. Spier prescribed meclizine[2] for her dizziness and referred Plaintiff to psychiatry and counseling "re mood affecting headaches/depression." (AR 286). Plaintiff went to the emergency room on April 4 and reported a week-long constant, severe headache and nausea. (AR 341-47). She stated her prednisone taper was not working. (AR 340).

The Emergency Department physician described Plaintiff's headache status as "severe exacerbation" and "inadequately controlled." (AR 342). After consulting with Dr. Spier and the on-call neurologist, Plaintiff was prescribed Compazine, Benadryl, and DHE, which helped resolve the headache. (AR 344). The Emergency Department physician ruled out subarachnoid hemorrhage and meningitis, and decided to discharge Plaintiff. (AR 344). He concluded her symptoms "appear[ed] to be a complication from her chronic migraines," and recommended that Plaintiff contact her neurologist the next day. (AR 344). In a follow-up call with Dr. Rodriguez on April 6th, Plaintiff stated her headache was better on Naproxen and Tylenol, but she was worried because "she is needing the Tylenol more often, ~ 4 hrs." (AR 345). Two days later, Plaintiff received a Toradol injection. (AR 347).

Kaiser Permanente submitted medical information to the claim administrator on April 15, 2016, which included: a no-show note for a doctor appointment on April 4; a progress note from Plaintiff's April 4 Emergency Department visit; documentation of Plaintiff's April 8 Toradol injection; and a January 14, 2016 Work Status Report placing Plaintiff off work through July 3, 2016. (AR 338-348). The claim administrator concluded the medical information

---

[2] The NIH website states Meclizine "is used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness" and may be ingested as "a regular and chewable tablet and a capsule." *Meclizine*, MedlinePlus (last updated July 25, 2018) https://medlineplus.gov/druginfo/meds/a682548.html.

16-cv-2613-BTM-BGS

did not support Plaintiff's request for an extension of her established disability because the documents revealed "no objective abnormalities" and instead showed that Plaintiff "reported relief of symptoms after being seen." (AR 241). The claim administrator once more referred Plaintiff's claim to Physician Advisor Dr. Duvall for review. (AR 241).

Dr. Duvall called but was unable to make contact with Plaintiff's treating neurologist before writing her April 22, 2016 report. (AR 332).  Dr. Duvall noted that after Plaintiff's April 4 emergency room visit, Plaintiff's headache was resolved and was better on Naproxen and Tylenol. (AR 333).  Although Dr. Duvall received documentation that Plaintiff received a Toradol injection a few days later, the document contained no additional information about Plaintiff's symptoms or their resolution. (AR 333).  Dr. Duvall concluded that from an occupational medicine perspective, "the objective findings are insufficient to support inability to do her usual job duties including sitting, typing and talking," or the need for restrictions and limitations from April 18, 2016 forward. (AR 333). Plaintiff's disability claim was rejected. (AR 320-321).

On May 24, 2016, Dr. Spier saw Plaintiff and noted her active problems included: anemia, MS, leukocytosis (increased white blood cells in blood), headache, MS exacerbation, atypical migraine, migraine, transformed migraine, chronic migraine with status migrainosus, major depressive disorder, and anxiety. (AR 290).  Dr. Spier increased Plaintiff's Topamax dosage, continued nortriptyline, referred Plaintiff for acupuncture and massage therapy, and prescribed additional injections for Plaintiff's headache in conjunction with Zofran and Benadryl. (AR 289-90).

Plaintiff appealed the denial in June 2016. (AR 254-55, 312, 316-17).  Dr. Spier submitted a work status report placing Plaintiff off work from July 5, 2016 through September 30, 2016. (AR 310).  The Quality Review Unit referred Plaintiff's appeal to two Physician Advisors: (1) Woodley B. Mardy-Davis, M.D.,

Anesthesiology (AR 305); and (2) Ekokobe Fonkem, D.O., Neurology (AR 301).

Dr. Mardy-Davis concluded Plaintiff was capable of work from a pain medicine perspective, because "symptoms of headaches may be improved with intermittent Solu-Medrol IV infusion and adjustment of work environment including noise and light reduction." (AR 304). Dr. Mardy-Davis observed "[c]omplete pain relief often does not occur until after resumption of normal acitivites" and "it is not necessary for the patient to wait until all pain is eliminated before returning to work." (AR 304). Dr. Mardy-Davis further noted "a lack of evidence of pain and disability non-responsive to conservative therapy" and "a lack of documentation of diagnostic testing such as EMG/NCV demonstrating motor or sensory deficits." (AR 304). No contact was made with Dr. Spier prior to writing the report. (AR 303).

Dr. Fonkem concluded Plaintiff was not disabled from her regular job from a neurological perspective. (AR 299). Dr. Fonkem explained that although "the patient has headaches associated with nausea and MS," the documentation did not "detail objective evidence of significant functional deficits that would prevent the patient from performing her job." (AR 300). Dr. Fonkem's synopsis detailed Plaintiff's medical history at length, but the rationale noted only the April 6, 2016 follow-up call in which Plaintiff stated she felt better after taking naproxen and Tylenol. (AR 300). Dr. Fonkem concluded the April 2016 documentation supplied only "subjective complaints but does not provide updated objective evidence of significant functional deficits that would prevent the patient from performing her occupation from a neurology perspective." (AR 300).

Plaintiff appeals.

## III.  LEGAL STANDARD

A denial of benefits claim in an ERISA case "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms

of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the benefit plan confers such discretionary authority, then the decision to deny benefits is reviewed for abuse of discretion. *Id.* Courts should also consider any conflict of interest in the plan's administration. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006). "[A]n insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest." *Id.* (citing *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir.1999)). In the event of a structural conflict of interest, the Ninth Circuit has instructed courts to apply abuse of discretion in a manner "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." *Id.*

Although Plaintiff initially argued that a conflict of interest existed that warranted an "enhanced skepticism" standard of review, Plaintiff has since conceded "because AT&T delegated decision-making authority to a third-party administrator, no conflict of interest exists and the correct standard of review is abuse of discretion." (ECF No. 37 at 1). As it is undisputed that AT&T delegates its authority to a third-party, Sedgewick, to render benefits determinations, and because the Court finds no other basis in the record to infer a conflict of interest, the Court reviews the denial under the abuse of discretion standard. *See Hegarty v. AT & T Umbrella Benefit Plan No. 1*, 109 F. Supp. 3d 1250, 1255 (N.D. Cal. 2015); *May v. AT&T Umbrella Plan No. 1*, 2012 WL 1997810 at *13-14 (N.D. Cal. June 4, 2012).

"Where, as here, the abuse of discretion standard applies in an ERISA benefits denial case, a motion for summary judgment is, in most respects, merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929–30 (9th Cir.2012) (citations, internal quotation marks omitted). "In the absence of a

conflict, judicial review of a plan administrator's benefits determination involves a straightforward application of the abuse of discretion standard." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009). A court's review is generally limited to the administrative record; however, if the court in its discretion examines evidence outside the administrative record, then traditional summary judgment rules apply. *Abatie*, 458 F.3d at 970; *Nolan v. Heald College*, 551 F.3d 1148, 1150 (9th Cir. 2009).

"An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle N.F.L. Ret. Plan,* 410 F.3d 1173, 1178 (9th Cir. 2005). Under the "deferential" abuse of discretion standard, "a plan administrator's decision 'will not be disturbed if reasonable.' " *Stephan*, 697 F.3d at 929. "This reasonableness standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.' " *Id.* (quoting *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011)).

## IV.   DISCUSSION

Plaintiff challenges the reasonableness of the claim administrator's denial of her appeal. The crux of Plaintiff's argument is that the decision was unsupported and premised upon clearly erroneous findings of fact. (See ECF No. 41 at 16-25). Plaintiff contends it was an abuse of discretion to rely on medical opinions of Physician Advisors (PA) Dr. Mardy-Davis and Dr. Fonkem because neither PA examined Plaintiff or consulted with her treating physicians; both unreasonably rejected her complaints of migraine pain as subjective and without support; and both ignored objective evidence of her disability. (ECF No. 41 at 16-23). Plaintiff asserts it was illogical to determine Plaintiff's condition had improved

based on the resolution of one migraine after an ER visit, and that the PA's ignored the medical opinions of Dr. Brock and Dr. Spier, both of whom found Plaintiff was disabled. (ECF No. 41 at 25). Accordingly, Plaintiff claims she is entitled to Long Term Disability (LTD) benefits based on the record. (ECF No. 41 at 25).

Defendant contends that the claim administrator provided a detailed explanation for its decision, the decision does not conflict with the Plan language, and the decision was well supported and not based on any clearly erroneous factual findings. (ECF No. 42-1 at 21-24). Defendant argues that Plaintiff's MS diagnosis does not automatically render her disabled under the Plan, and that the claim administrator reasonably found that the submitted medical information was conclusory and did not constitute updated objective evidence of a disability to support her claim from April 18, 2017 onward. (ECF No. 35 at 12-13). Defendant further asserts the claim administrator properly relied on Dr. Mardy-Davis and Dr. Fonkem's analyses and opinions, and that the scant medical information supplied supported the denial. (ECF No. 35 at 11-19).

The Ninth Circuit has recognized that reports of pain are often necessarily subjective, and has remanded claims that were denied for lack of "objective" evidence of disabling pain when it was difficult to provide such objective measurements. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (holding it was arbitrary to deny claim of chronic fatigue syndrome for lack of objective evidence because "conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious"); *Saffon v. Wells Fargo & Co. Long Term Disability*, 522 F.3d 863 9th Cir. 2008) (noting "individual reactions to pain are subjective and not easily determined by reference to objective measurements"). Courts also consider factors such as whether, after citing a lack of objective evidence as a basis for denial, the plan administrator failed to conduct its own examination or address the contrary

opinion of a treating physician. *See, e.g.*, *Salomaa*, 642 F.3d at 676; *Hegarty v. AT&T Umbrella Benefit Plan No. 1*109 F.Supp.3d 1250, 1258 (N.D. Cal. 2015).

In situations where a claimant was previously determined eligible for disability benefits and the documentation shows no changes or improvements in the disabling symptoms, courts have found subsequent denials "illogical" and clearly erroneous. *See Saffon*, 522 F.3d at 871 (rejecting defendants' rationale that claimant's LTD benefits should be denied because documentation showed no "progression in degeneration" and holding "[i]n order to find [claimant] no longer disabled, one would expect the MRIs to show an *improvement*, not a lack of degeneration"); *May v. AT&T Umbrella Ben. Plan No. 1*, No. c-11-02204, 2012 WL 1997810 at *15-16 (N.D. Cal. June 4, 2012) (holding "to the extent the updated medical records document essentially the same disabling symptoms that the Plan previously found to be disabling, the Plan's termination of [STD] benefits was illogical and . . . supports a finding of clear error"). However, although an initial finding of disability "may be considered evidence of the claimant's disability" in a subsequent claim or appeal, paying benefits at one point does not "operate[ ] forever as an estoppel so that an insurer can never change its mind." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1296-97 (9th Cir. 2010). And to the extent an administrator received medical documentation containing numerous contradictions between self-reported pain and objective findings, a denial of benefits will be upheld. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004) (holding administrator did not abuse discretion because claimant's chart "had a number of objective and subjective indications" that her fibromyalgia pain was not disabling, including physician's observations that claimant was in no acute distress and was freely ambulatory, as well as claimant's self-reported physical activities) *overruled on other grounds by Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011); *Martin v. Aetna Life Ins. Co.*, 223 F.Supp.3d 973, 985-86 (C.D.

Cal. 2016) (upholding denial of benefits because treating physician's findings were in conflict with claimant's self-reported pain and PA's were not required to take treating physician's "one sentence recommendation . . . as conclusory evidence of [claimant's] disability").

Upon reviewing the full administrative record, and applying these holdings, the Court concludes that the decision was illogical and without support in inferences that may be drawn from the facts in the record. *See Stephan*, 697 F.3d at 929. The decision was an abuse of discretion because the claim administrator (1) unreasonably discounted Plaintiff's subjective reports of pain; (2) erroneously concluded that Plaintiff's symptoms had improved; and (3) failed to conduct its own examination or address the conflicting opinion of previous PA's and treating physicians.

## A. The Claim Administrator Unreasonably Discounted Plaintiff's Subjective Reports of Pain.

 "A plan's denial is arbitrary to the extent that it was based on a consulting phyisician's implicit rejection of a Plaintiff's subjective complaints of pain." *James v. AT&T West Disability Benefits Program*, 41 F.Supp.3d 849, 880 (N.D. Cal. 2014) (internal quotations and alterations omitted). Migraine pain is not readily proven by laboratory tests, and work limitations that are consequential to that pain "are likely to defy objective clinical proof." *Hegarty*, 109 F.Supp. 3d at 1257; *see also* Salomaa, 642 F.3d at 677 (finding significant the absence of any objective test for chronic fatigue syndrome). "By effectively requiring 'objective' evidence for a disease that eludes such measurement" a plan "establishe[s] a threshold that can never be met by claimants who suffer . . . no matter how disabling the pain." *James*, 41 F.Supp.3d at 881 (quoting *Minton v. Deloitte & Touche USA LLP Plan*, 631 F.Supp.2d 1213, 1220 (N.D. Cal. 2009)).

Here, the primary ground for denying Plaintiff's disability benefits was that the documentation of her disability was too subjective. Dr. Fonkem deemed

Plaintiff's "subjective complaints" insufficient evidence "of significant functional deficits that would prevent [her] from performing her occupation." (AR 300). Dr. Mardy-Davis made general statements that "symptoms of headaches may be improved" by adjusting work environments and administering medication, and remarked upon a "lack of evidence of pain" and "lack of documentation of diagnostic testing such as EMG/NCV demonstrating motor or sensory deficits." (AR 304). But there is no objective test for migraine pain, and the PA's discount the available evidence of years of repeated emergency visits and Plaintiff's self-reported debilitating pain from rebound migraines. The Court concludes that this disregard for Plaintiff's subjective complaints of pain and "reliance on the absence of medical evidence that cannot exist [is] arbitrary and capricious and thus unreasonable." *Hegarty*, 109 F.Supp. 3d at 1257 (quoting *Salomaa*, 642 F.3d at 678).

**B. The Claim Administrator Ignored Objective Evidence And Erroneously Concluded Plaintiff's Symptoms Had Improved.**

The Court finds Defendant's reasoning, that Plaintiff is no longer disabled because she experienced brief relief between a migraine that sent her to the ER and a migraine that required a Toradol injection, illogical given the nature of migraines and the objective evidence of pain and attempts at pain management in the record. *See James*, 41 F.Supp.3d at 880 (concluding administrator abused discretion when it "essentially disregarded" plaintiff's history of pain and pain treatment since 2007 and failed to explain why that history was "insufficient to find her unable to work).

The medical submission shows the same objective evidence of Plaintiff's pain that previous PA's deemed disabling. In Dr. Duvall's November 2015 report, she stated, "[i]n general, one would not expect significant objective physical exam findings or test results with migraine type headaches; however, if headaches are severe and refractory, the condition can be disabling." (AR 633).

16-cv-2613-BTM-BGS

She found Plaintiff disabled because "the severity of the headaches is supported by [Plaintiff's] ER visit, medication adjustments and changes, and need for steroids" and that "[h]er condition may also be complicated by her Multiple Sclerosis." (AR 634). Similarly, Dr. Brock averred that Plaintiff was disabled and incapable of work because the documentation demonstrated "the presence of ongoing migraine headache" requiring "repeated medical visitations and medical administrations" and a "history of multiple sclerosis with a progressive episode, and experiencing weakness of bilateral lower extremities that required IV Solu-Medrol." (AR 382-83).

From April onward, Plaintiff submitted objective evidence of symptoms consistent with Plaintiff's history of pain and pain management that PA's previously found showed she was unable to work. Contrary to Defendant's characterization of Plaintiff's claim, Plaintiff does not rely on the fact of her MS diagnosis alone. (*See* ECF No. 35 at 12). The evidence submitted included documentation of an emergency room visit for a severe and uncontrolled migraine headache associated with MS, administration of different medications, a Toradol injection two days later, and a note from her treating physician placing her off work. The claim administrator thus improperly ignored updated subjective and objective evidence demonstrating Plaintiff's disability.

The claim administrator's conclusion that Plaintiff's follow-up call with Dr. Rodriguez, in which she stated her symptoms were mitigated after the ER visit, demonstrated that Plaintiff had improved and could work is unreasonable for a couple of reasons. First, it is illogical to presume that Plaintiff's statement admitting reprieve from pain between migraines showed that she was able to work. Plaintiff suffers from chronic, severe refractory migraine headaches; she experienced some relief after receiving strong medications at her ER visit, and attempted to manage her pain with Tylenol only to be administered a Toradol injection two days later. (AR 339-345, 347). The nausea and headache she

16-cv-2613-BTM-BGS

experienced, described by the ER physician as "severe exacerbation" and "inadequately controlled," had persisted for a week prior to the ER visit. (AR 339-345). The logical inference given her medical history is that her headache returned and increased in severity over the intervening days, just as it had previously. Migraines render individuals unable to withstand light or sound, which Plaintiff's work necessitates and previous PA's have acknowledged, and she was still suffering from them. (AR 469). Although Dr. Mardy-Davis and Dr. Fonkem stated Plaintiff's migraines could be controlled with medication, the record shows that Plaintiff continued to take medications that failed to do so. (AR 342, 415-17, 420-21, 424, 428, 572-73).

Second, there are no inconsistencies between Plaintiff's self-reporting and the objective findings, as there were in cases cited by Defendant in which the presiding court upheld the claim administrator's decision. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004); *Martin v. Aetna Life Ins. Co.*, 223 F.Supp.3d 973, 985-86 (C.D. Cal. 2016). Unlike the claimant in *Jordan*, who reported performing very physical household chores that the court found "cut against a determination of severe pain" from fibromyalgia, here, Plaintiff has not reported any such inconsistent activities. *Jordan*, 370 F.3d at 880. Plaintiff's case is similarly distinguishable from *Martin*, where the claimant complained of multiple joint pain and ligament tearing, but his xrays "revealed a well-healed metacarpal trapezial fusion," and he demonstrated normal range of motion, strength, and sensations in a hand and wrist examination. *Id.* at 977-78. To the contrary, no medical exam suggested Plaintiff was not suffering from chronic migraines or that she was not debilitated when one or a cluster struck. Moreover, Plaintiff's diagnosis of chronic migraines and MS exacerbation was supported by numerous ER and doctor's visits, as well as a history of meninigitis and MRIs showing multiple brain lesions from MS. *Cf. Jordan*, 370 F.3d at 881 (concluding there was nothing arbitrary or capricious "in

finding inadequate, with the support of qualified physicians, a claim of disability supported only by a diagnosis of fibromyalgia with no explanation of why it should amount to a disabling condition").

Finally, the Court notes that Dr. Fonkem mistakenly described Plaintiff's follow-up call with Dr. Rodriguez as an in-person exam. (*See* AR 300 (stating "the patient *saw* V. Rodriguez following her ER visit for headache" and describing it as an "exam") (emphasis added)). Dr. Fonkem thus relied on more than one clearly erroneous finding of fact in determining Plaintiff was not disabled.

Given the foregoing, it was clear error to conclude Plaintiff was able to work simply because she experienced a reprieve between chronic, severe migraines after an ER visit. The PA's ignored objective evidence of unchanged debilitating migraines, required clinical proof of Plaintiff's pain that is unlikely to exist, and erroneously characterized Plaintiff's history of pain management. The claim administrator's denial of benefits was therefore arbitrary and capricious. *See Saffon v. Wells Fargo & Co. Long Term Disability*, 522 F.3d at 871; *May*, 2012 WL 1997810 at *15-16.

**C. The Claim Administrator Failed to Conduct its Own Examination or Address the Conflicting Opinions of previous PA's and treating physicians.**

Further reinforcing the Court's conclusion that the claim administrator's decision was unreasonable is the administrator's failure to (1) conduct its own examination or (2) address the medical opinions of previous PA's and Plaintiff's treating physician supporting a disability finding. *See, e.g.*, *Salomaa*, 642 F.3d at 676; *Hegarty v. AT&T Umbrella Benefit Plan No. 1*109 F.Supp.3d 1250, 1258 (N.D. Cal. 2015).

The claim administrator did not meaningfully address the opinions of its previous PA's and Dr. Spier, Plaintiff's treating physician. Although plan administrators need not "accord special deference to the opinions of treating

16-cv-2613-BTM-BGS

physicians," these opinions are relevant to determining whether the claim administrator abused its discretion. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003). Defendant contends that Dr. Spier's conclusion that Plaintiff is disabled is undermined by statements she made to a PA evaluating Plaintiff from a psychiatry perspective. (ECF No. 42-1 at 23). Defendant urges the Court to consider that after Dr. Spier relayed that Plaintiff's legs were weak at her last visit, she said Plaintiff's "exams are not reliable because she gives way and it is impossible to identify if there is any real weakness." (AR 371). But this statement relates to her leg weakness, not to her headaches, which are Plaintiff's primary disability for STD benefit purposes. (AR 371). Although Dr. Spier was still "working on finding out why [Plaintiff] has so many headaches," and she suspected "some secondary gain," she also said Plaintiff "has real illnesses" and that she was investigating whether meningitis could be causing Plaintiff's headaches. (AR 371). Dr. Spier's statements to the psychiatry PA therefore did not "undermine[ ] any claim of disability," as Defendant argues. (ECF No. 42-1 at 23). In addition, this was not one of the bases cited by the reviewing PA's for denying Plaintiff's STD benefits, and so does not support Defendant's argument.

Furthermore, Dr. Spier's statements to the PA investigating Plaintiff's psychiatric fitness does not change the fact that neither Dr. Mardy-Davis nor Dr. Fonkem successfully contacted Dr. Spier about Plaintiff's migraine pain during the period in question. The Court notes that a previously skeptical Dr. Duvall changed her mind after consulting with Dr. Spier about Plaintiff's condition. (AR 633-34). This failure to consult is not insignificant in this case, particularly where, as Duvall noted, "[i]n general, one would not expect significant objective physical exam findings or test results with migraine type headaches." (AR 634).

Finally, to the extent that Dr. Mardy-Davis found fault in Plaintiff's submission because it lacked diagnostic testing, such as EMG/NCV demonstrating motor or sensory deficits, Defendant should have ordered further

16-cv-2613-BTM-BGS

tests. (AR 304). The claim administrator reserved discretion to order such an examination before determining whether to grant STD benefits under the Plan. (AR 69-70). Nevertheless, no additional examination of the Plaintiff was requested.

Accordingly, the Court concludes the claim administrator abused its discretion in denying Plaintiff's claim. The Court remands Plaintiff's claim for the awarding of STD benefits.

### D. Long Term Disability Benefits

The Court agrees with Defendant that it is improper to make a determination regarding LTD benefits at this juncture, and denies Plaintiff's request to hold she is entitled to LTD benefits before she has applied for them. The Court remands this matter to the claims administrator to determine whether Plaintiff is entitled to LTD benefits or would have been entitled to LTD benefits had her STD benefits not terminated.

### V. CONCLUSION

Plaintiff's Motion for Summary Judgment is granted in part, and Defendant's Motion for Summary Judgment is denied. The Court remands Plaintiff's claim for further proceedings consistent with this opinion. The Clerk shall enter a final judgment accordingly.

IT IS SO ORDERED.

Dated: March 4, 2019

Honorable Barry Ted Moskowitz
United States District Judge

16-cv-2613-BTM-BGS